[No. F009445. Fifth Dist. Aug. 18, 1988.]

In re HEATHER P., a Person Coming Under the Juvenile Court Law.
KERN COUNTY DEPARTMENT OF HUMAN SERVICES, Plaintiff and Respondent, v.
MARY KUHN, Defendant and Appellant.

**COUNSEL**

Elizabeth McDonald, under appointment by the Court of Appeal, for Defendant and Appellant.

B. C. Barmann, County Counsel, Marvin R. Coston and Margo Raison, Deputy County Counsel, for Plaintiff and Respondent.

David D. Carico, under appointment by the Court of Appeal, for Minor.

OPINION

BEST, J.—

### STATEMENT OF THE CASE

A petition was filed on February 26, 1986, in Kern County Superior Court alleging that Heather P., then one year of age, came within the provisions of Welfare and Institutions Code section 300, subdivision (a).[1]

The petition contained the following special allegations: "1. On or about February 24, 1986, said minor's mother was arrested on an out-of-county warrant for theft.

"2. Said minor's mother has a history of mental problems and has been hospitalized several times during the past few years due to these problems.

"3. Said minor's mother has had her two other children removed and subsequently freed for adoption in Los Angeles County due to said minor's mother's inability to care for and supervise the children."

At the February 27, 1986, detention hearing, Mary Kuhn, appellant herein and Heather's mother, denied the allegations of the petition. The court found Heather to be a person described by section 300, subdivision (a), and continued the matter for a contested jurisdiction hearing. The court further ordered that Heather was to remain in shelter care or "emergency rate home" pending the jurisdictional hearing.

At the jurisdictional hearing held on March 20, 1986, the court appointed Dr. Bird to perform a psychological examination of Ms. Kuhn, and the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated. Section 300 provides in pertinent part: "Any person under the age of 18 years who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] "(a) Who is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent, guardian or custodian actually exercising care or control."

hearing was continued. At the continued hearing, the court found Heather to be a person described by section 300, subdivision (a).

At the dispositional hearing held May 16, 1986, counsel for appellant and respondent stipulated that Attorney Joseph Pluta could serve as a temporary judge. The court found clear and convincing evidence that there was a substantial danger to the physical health of the minor, that there were no reasonable means to protect minor's physical or emotional health without removal of the minor from the parent's custody, that reasonable efforts had been made to prevent or eliminate the need for the removal of the minor from the home and to make it possible for the child to return home, and that a return of the minor to the physical custody of the parent would create a substantial risk of detriment to the physical or emotional well-being of the minor. Heather was adjudged a dependent child of the court and placed in the care and custody of the welfare department. The mother was ordered to participate in child welfare services, including educational programs and counseling as deemed necessary by the social worker.

At the review hearing held on December 15, 1986, the court found that the minor's status had been reviewed pursuant to section 366 and continued the minor as a dependent child of the court. The court found that a return of the minor to the physical custody of the parent would create a substantial risk of detriment to the physical or emotional well-being of the minor. The court further found that there was a substantial probability that the minor would be returned to the care of the minor's parent within six months, and the court ordered family reunification services for another six months. The court ordered that all prior orders remain in effect.

At the review hearing held on May 14, 1987, the minor was continued a dependent child of the court. The court found that the return of the minor would create a substantial risk of harm to the minor and ordered that all prior orders would remain in effect.

At the contested review hearing held on September 18, 1987, Beverly Stearns testified on behalf of the mother. The court found that there had been "moderate compliance" with the reunification plan. The court further found that a return of the child to the mother would create a substantial risk of detriment to the child and continued the minor as a dependent child of the court. The court further found that there was not a substantial probability that the minor would be returned to the mother's care within six months and terminated reunification services. The minor was continued a dependent child of the court and it was ordered that permanent planning proceedings pursuant to section 366.25 be conducted.

On October 27, 1987, Ms. Kuhn filed a timely notice of appeal from "the orders issued by the court at the permanency planning hearing held on September 18, 1987."

STATEMENT OF FACTS

The social worker's report filed in preparation for the May 16, 1986, disposition-review hearing states that on February 24, 1986, Heather was placed in protective custody because her mother was arrested on a Los Angeles County warrant for theft. Ms. Kuhn, Heather's mother, was in jail until early March 1986.

Regarding Ms. Kuhn's personal history, the social worker's report stated that Ms. Kuhn was a dependent child of the court from the time she was approximately one year of age until she was eighteen. As an adolescent, Ms. Kuhn began exhibiting emotional and behavioral problems. According to her foster mother, Ms. Kuhn was hospitalized for mental problems approximately 16 times between the ages of 16 and 20. Ms. Kuhn married at 20 years of age. Her mental problems sharply escalated, and she was hospitalized often for mental illness. She was eventually diagnosed as paranoid schizophrenic. During this time her first child was born, and the child's father took the child to Ms. Kuhn's previous foster mother, Mrs. Chaffin, as Ms. Kuhn was exhibiting bizarre behavior and the father feared for the safety of the child. The foster mother raised the boy until he was placed with adoptive parents.

Meanwhile, the Kuhn marriage floundered due to Ms. Kuhn's regular incarcerations and lack of employment and her mental illness. She was in and out of therapy and terribly transient in her living arrangements. Mrs. Chaffin, the foster mother, reported that often during this period Ms. Kuhn simply disappeared and " 'turned into a bag lady.' " Mrs. Chaffin often had to pick her up from mental wards in Orange County, Los Angeles and Long Beach.

In 1982, Ms. Kuhn became pregnant by a man she knew only as "Mike." The boy was left by Ms. Kuhn with Mrs. Chaffin from birth. Both boys were made dependents of the court shortly after the second child's birth.

Ms. Kuhn gave birth to Heather in 1984. Heather's father is unknown. In 1985, Mrs. Chaffin became seriously concerned with the state of Ms. Kuhn's mental health. Ms. Kuhn was refusing to take her medication and was not involved in counseling. Ms. Kuhn told Mrs. Chaffin that Ms. Kuhn was hearing voices, seeing things, and that people were attempting to harm her. Before the Los Angeles authorities had an opportunity to investigate

Ms. Kuhn's ability to parent the child, Ms. Kuhn moved to Nevada and then to Lake Isabella where she resided at the time of her arrest.

On February 26, 1986, the social worker contacted an adoptions worker in Los Angeles who related that Ms. Kuhn was well known to the agency. Ms. Kuhn, the worker reported, had a history of mental problems, had stays in mental hospitals and had a very transient lifestyle. Her two older children were freed for adoption in 1985 because of abandonment.

Dr. David Bird, a psychologist, conducted a psychiatric examination of Ms. Kuhn in April 1986 and concluded that Ms. Kuhn showed a " 'gross incompetency due to a likely chronic condition and schizophrenia. She presents as incompetent in meeting her own survival needs, let alone those of a dependent minor. Mentally she does not present as capable of parenting.' " The social worker's report states that Dr. Bird "strongly felt that further psychological assessment and treatment would be necessary prior to any extended visitation or trial return of the minor to her."

Dr. Bird further concluded that "Ms. Kuhn does not exhibit adequate, nondetrimental or healthy parenting capabilities. In contrast, she presents the most detrimental and potential dangerous tendencies in her parental frame of reference."

At the continued jurisdictional hearing held May 2, 1986, the special allegations were dismissed on motion of the county counsel. The report of the social service worker dated May 9, 1986, states that at that hearing Ms. Kuhn admitted to the amended petition. However, the social worker also reported, "Ms. Kuhn denies she has mental problems, is not taking medication, and does not feel she needs therapy." The social worker further stated, "Since the Detentional Hearing, Ms. Kuhn has made no definite progress towards alleviating the need for Court action. She is not in therapy, nor has she maintained residence in a single place for more than a few weeks. She has only had one visit with the minor."

The social worker concluded that protection of Heather was necessary "until Ms. Kuhn completes extensive therapy, is stabilized and on proper medication, and has demonstrated the ability to establish and maintain a single residence for a period of at least six months." The social worker's report set forth a plan for family reunification.

At the May 16, 1986, dispositional hearing, counsel submitted the matter on the report of the social worker, and the court ordered that the minor be adjudged a dependent child of the court. The court ordered reunification services.

The social worker's report prepared for the next review hearing indicated that Heather and Ms. Kuhn had received family reunification services from a social worker since May 1986. The report stated in part: "Supervising Social Service Worker, Adela Medina, and Mrs. Kuhn established a service plan; of Mrs. Kuhn participating in counseling dealing with the reasons that led to the minor's removal and for Mrs. Kuhn to receive a positive written evaluation from a therapist for the minor's return to her home. Additionally, the minor's mother was to successfully complete parenting classes and to receive again a positive recommendation from the therapist. Further, Mrs. Kuhn was to secure housing, meeting community standards, and to have stable housing for at least a six-month period."

The report indicated that services to Ms. Kuhn had been "marginally successful." She had moved three times since August. She had been in therapy with Dr. John Chaney, Ph.D. "As of the writing of this report, it is unknown how long Ms. Kuhn has been receiving psychological therapy or what her progress has been as a report is unavailable at this time."

Meanwhile, Heather had remained in the same foster home since March 1986. She had adjusted to the home and built bonds of trust and affection with the foster parents. Ms. Kuhn had maintained monthly visits with Heather. Although Heather was usually quiet and did not voluntarily interact with Ms. Kuhn during visitation, the foster parents did not report any abnormal or disruptive behavior by Heather after visitation.

The social worker recommended further reunification services consisting of Ms. Kuhn completing a program of parenting classes and receiving a positive evaluation from the instructor. Additionally, it was proposed that Ms. Kuhn remain in psychological sessions with Dr. Chaney and that Heather's return not be considered until Dr. Chaney could provide an evaluation and positive statement recommending the minor's return to the mother's physical custody.

At the December 15, 1986, review hearing, Heather was continued a dependent child of the court.

The social worker's report prepared for the review and permanency-planning hearing set for May 14, 1987, indicates that at the time of the preparation of the report Ms. Kuhn had maintained her residence for approximately a six-month period. She had also maintained her scheduled visits with Heather. Further, the report reflects that she had been receiving psychiatric-psychological therapy: "In the letter dated December 10, 1986, the mother's current therapist, Dr. Corrine Schroeder, Ph.D., stated that she had seen Mary Kuhn twice a month for parent education and psychothera-

py and had co-attended Mrs. Kuhn's case with Dr. John Beck while she was in the Victorville Mental Health Unit. Dr. Schroeder went on further to say that Mrs. Kuhn has made good progress in her ability to manage the stresses and strains of daily living, and had maintained emotional stability since her discharge from the mental health unit on October 2, 1986. At that time, Dr. Schroeder recommended a six-month extension in order for Mrs. Kuhn to get her affairs straightened out. On April 30, 1987, the undersigned spoke with Dr. Schroeder regarding Mrs. Kuhn's progress in therapy since the letter of December 1986. Dr. Schroeder advised the undersigned that Mary Kuhn continue [sic] to function well as long as she is on her medication. The doctor further stated that Mrs. Kuhn has been maintaining her twice monthly counseling appointments and that she is cooperative and receptive to therapy. The doctor noted that Mary Kuhn has made progress in therapy, but that more of an improvement is required before the minor could be allowed back into Mrs. Kuhn's physical custody. Dr. Schroeder stated that Mrs. Kuhn's motivation is very high to get Heather back into her physical custody, and that has been her total focus in therapy."

While the social worker reported that Ms. Kuhn had met all the requirements of the service plan, an unidentified "reporting party" had reported that Ms. Kuhn was not staying in the apartment she rented, but stayed with her boyfriend most of the time. The reporting party also stated that the apartment was not well cared for and that it smelled of cats, which had been neglected by Ms. Kuhn.

The report also states that initially Heather is reluctant to have contact with Ms. Kuhn and must be coaxed by her mother. Heather interacts even less with her mother when other adults are present in the room.

Although Ms. Kuhn completed the requirements of the service plan, the social worker could not recommend that Heather be placed in her custody because Ms. Kuhn had not received a positive evaluation from her therapist indicating that the minor would be at a low or no risk for neglect or endangerment if she were returned to Ms. Kuhn's custody. It was recommended that the reunification services continue in order for the mother's therapist to fully assess Ms. Kuhn's progress in therapy and to provide a statement to the court at the next review hearing in August regarding the possibility of Ms. Kuhn obtaining physical custody of the minor.

The report prepared for the August 1987 review hearing indicated that Ms. Kuhn had maintained a residence for approximately one year. The mother had maintained monthly visits with Heather. The social worker repeated her previous report that although the mother had completed the requirements of the service plan, she had not received a positive evaluation

from her therapist indicating that the minor would be at a low risk for neglect or endangerment if returned to her mother's custody. The report, however, gave no update of contacts with the therapist.

The report recommended that reunification services be terminated and that Heather be placed in a permanent plan of long-term foster care with a transfer of jurisdiction to San Bernardino County. Adoption was deemed not to be an option because there were no supporting legal grounds per Civil Code section 232.

The August hearing was continued to September 18, 1987. At the September review hearing, counsel for Ms. Kuhn called one witness, Beverly Stearns, who cares for elderly people in her home. Mrs. Stearns had known Ms. Kuhn for four years and had been to Ms. Kuhn's house. Mrs. Stearns had no concern regarding the maintenance of Ms. Kuhn's home.

Mrs. Stearns further testified that her husband is the minister of the First Southern Baptist Church, which Ms. Kuhn had been attending for two years. Ms. Kuhn also worked in the church nursery for three hours per week taking care of children up to three years of age. Mrs. Stearns had no concern regarding Ms. Kuhn working with children, although she did a year earlier. Mrs. Stearns reported that a year earlier Ms. Kuhn was not taking her medication, but she was currently taking her medication. Mrs. Stearns further stated that if Heather were her own child she would not be concerned about Ms. Kuhn caring for Heather.

The court found by a preponderance of the evidence that a return of the child to the physical custody of Ms. Kuhn would create a substantial risk of detriment to the physical or emotional well-being of the child. The court also found by a preponderance of the evidence that there had been moderate compliance with the case plan and progress toward alleviating or mitigating the causes for the minor's placement in foster care.

The court also found that there was not a substantial probability that the minor would be returned to the care of the mother within six months, and ordered that family reunification services be terminated. The court thus ordered that all prior orders remain in effect and that a permanency planning proceeding pursuant to section 366.25 be conducted. Finally, the court found the minor is not likely to be adopted and ordered the department of social services to institute proceedings for legal guardianship of the minor.

## DISCUSSION

### I

*Does Lack of Compliance With California Rules of Court, Rule 244,*
*Render the Orders of the Temporary Judge at the Dispositional*
*Hearing Void?*

On May 16, 1986, a temporary judge presided over the dispositional hearing in this case and adjudged the minor a dependent child of the court pursuant to section 300, subdivision (a), removed the minor from the custody of her mother, appellant herein, and ordered family reunification services be provided. ██ Although the record establishes that the temporary judge informed the parties present that he was a temporary judge and all agreed to proceed, plaintiff concedes the judge failed to comply with the requirements of article VI, section 21 of the California Constitution, rule 244 of the California Rules of Court and *In re Damian V.* (1988) 197 Cal.App.3d 933, 938 [243 Cal.Rptr. 185].

Article VI, section 21 of the California Constitution provides: "On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."

Rule 244 of the California Rules of Court specifies the following procedure for appointment of temporary judges: "The stipulation of the parties litigant that a case may be tried by a temporary judge shall be in writing and shall state the name and office address of the member of the State Bar agreed upon. It shall be submitted for approval to the presiding judge or to the supervising judge of a branch court. The order designating the temporary judge shall be endorsed upon the stipulation, which shall then be filed. The temporary judge shall take and subscribe the oath of office, which shall be attached to the stipulation and order of designation, and the case shall then be assigned to the temporary judge for trial. After the oath is filed, the temporary judge may proceed with the hearing, trial, and determination of the case.

"A filed oath and order, until revoked, may be used in any case in which the parties stipulate to the designated temporary judge. The stipulation shall specify the filing date of the oath and order.

"This rule does not apply to the selection of a court commissioner to act as a temporary judge."

In *In re Damian V., supra,* 197 Cal.App.3d 933, this court held that the requirements of California Rules of Court, rule 244, are mandatory, and that without the required written stipulation approved by the presiding judge and the oath of office subscribed to by the temporary judge in the appellate record, any orders or rulings by the temporary judge would necessarily be void as the temporary judge would have been without constitutional or statutory authority to act. (*Id.* at pp. 938-939.)

In this case, the record reveals only an oral stipulation by counsel for the welfare department (apparently also acting in the minor's behalf) and for the mother that the attorney could sit as a temporary judge "because a regular judge was not available." The record is devoid of any indication of compliance with the requirement of the filing of a written stipulation that the attorney could act as a temporary judge during the disposition hearing, approval of the stipulation by the presiding judge, or with the requirement that the temporary judge take the oath of office. Under these circumstances, the orders of the temporary judge were null and void under the authority of *In re Damian V., supra.* (See also *In re Mark L.* (1983) 34 Cal.3d 171, 178, fn. 5 [193 Cal.Rptr. 165, 666 P.2d 22]; contra, *In re Robert S.* (1988) 197 Cal.App.3d 1260 [243 Cal.Rptr. 459].)

II

*The Temporary Judge's Orders Being Void, What Effect Does This Have on the Subsequent Orders Appealed From?*

█ While conceding the error discussed above, plaintiff contends that it should not be deemed prejudicial per se. It should be noted that in footnote 3 in *In re Damian V., supra,* this court did apply a harmless error standard. This court stated as follows: "It is our view that the above reasoning and result does not apply to the father here. As previously stated, the father was present and stipulated to Temporary Judge Gwin's acting as judge at the November 14, 1986, hearing. In addition, at that hearing Temporary Judge Gwin only appointed counsel to represent the father and continued the hearing, as to him, to a later date. Thereafter, the petition to terminate father's parental rights was heard by a sitting superior court judge for the County of Merced. Thus, we conclude, the father was not prejudiced by any action or order of Temporary Judge Gwin. This result also comports with the reasoning and result in *In re Mark L., supra,* 34 Cal.3d 171, although that case involved application of California Constitution, article VI, section 21, and rule 244(b)." (*In re Damian V., supra,* 197 Cal.App.3d at p. 939, fn. 3.)

While counsel for appellant did orally stipulate to having the attorney sit as a temporary judge, unlike *Damian V.,* the temporary judge made some

critical decisions affecting substantial rights in this case. While regular judges sat on the periodic reviews regarding reunification and appropriate dispositions, none of them reviewed the temporary judge's judgment that the minor was a dependent child of the court pursuant to sections 300, subdivision (a), and 360. We also note that a showing of clear and convincing evidence is required to justify removal of a minor from parental custody (§ 361; Cal. Rules of Court, rule 1377(c)), whereas the subsequent status review permanency planning hearings required only a determination by a preponderance of the evidence whether the conditions which originally justified removal of the minor from the parent's custody were still operative. (§ 366.2, subd. (d); Cal. Rules of Court, rules 1378(d)(2), 1379(c)(1).) Thus, we conclude that the error cannot be declared harmless.

The voiding of the orders made by the temporary judge on May 16, 1986, also affects the subsequent orders contingent upon continuing the minor as a dependent child of the court, including the orders appealed from. All subsequent proceedings were dependent for their validity upon the validity of the order adjudging the minor a dependent child of the court since there would have been no dependent status to continue absent the previous adjudication. Thus, the order of September 18, 1987, which is appealed from here, must also be reversed.

## III

### *Sufficiency of the Evidence*

We have concluded that even had reversal not been required because of lack of compliance with California Rules of Court, rule 244, additional reasons would compel the same result.

■■■ Although not urged by the mother, minor contends: (1) that the evidence was insufficient to support a finding that a return of the minor to her mother would create a substantial risk of detriment to the minor's physical or emotional well-being; and (2) that the juvenile court erred by prematurely terminating reunification services between minor and her mother. As the two issues are closely related, they will be addressed as one issue regarding the sufficiency of the evidence.

In *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1132 [200 Cal.Rptr. 789], the court stated the rules for reviewing the evidence as follows: "It is well settled that our review on this issue is limited to whether the judgment is supported by substantial evidence. Issues of fact and credibility are questions for the trial court, not this court. [Citation.] 'The rule is clear that the power of the appellate court begins and ends with a determination as to

whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]"

Section 366.2 establishes the procedure for the court to follow at status review hearings: "(e) . . . The court shall order the return of the minor to the physical custody of his or her parents or guardians unless, by a preponderance of the evidence, it finds that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor. The probation department shall have the burden of establishing that detriment. The failure of the parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental. In making its determination, the court shall review the probation officer's report and shall consider the efforts or progress, or both, demonstrated by the parent or guardian and the extent to which he or she cooperated and availed himself or herself of services provided; shall make appropriate findings; and where relevant, shall order any additional services reasonably believed to facilitate the return of the minor to the custody of his or her parent or guardian. . . ."

In the instant case, the only evidence presented by respondent and upon which the juvenile court could make the determination as required in section 366.2, subdivision (e), were the reports of the social worker. In the most recent report dated August 27, 1987, the social worker concluded that mother had met all of the elements of the service plan, including visiting the child, receiving psychotherapy, training on parenting skills, and maintaining a residence. However, the social worker concluded as follows: "The undersigned cannot recommend the minor, Heather [P], be placed in the physical custody of her mother, Mary Kuhn, at this time. Although Mrs. Kuhn has completed the requirements of the service plan, she has not received a positive evaluation from her therapist indicating that the minor would be at low risk for neglect or endangerment if in Mrs. Kuhn's custody."

Because of Ms. Kuhn's failure to provide a "positive evaluation," the social worker was unable to recommend that the minor be placed in the physical custody of her mother; instead, the social worker recommended that family reunification services be terminated and permanent planning proceedings be conducted.

We find two problems with the social worker's final report: (1) it attempted to shift the burden of proof to mother, in contravention of section 366.2, subdivision (e); and (2) the report failed to provide sufficient evidence to establish by a preponderance of the evidence that the return of the child

created a substantial risk of detriment to the physical or emotional well-being of the minor.

Ms. Kuhn's case history, as set forth in the reports of the social worker, revealed that she had made significant improvement in a rather short period of time and appeared on her way to recovery when reunification services were terminated. The record reveals she had, in fact, changed her attitude toward her need for treatment, had improved her stability of residence, and had focused her life on reobtaining custody of her child. It is undisputed that Ms. Kuhn met all of the elements of the reunification plan, including visiting the child, receiving psychotherapy, training on parenting skills, and maintaining a residence.

Thus, pursuant to section 366.2, subdivision (e), there did not exist "prima facie evidence that return would be detrimental." Instead, the burden was on the probation department to establish by a preponderance of the evidence "that the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor."

Moreover, the final report indicated that there had been good efforts made by Ms. Kuhn as well as some progress into the problems which initially resulted in the minor becoming a dependent. In other words, establishing that the return of the child would create a substantial risk of detriment, given all of the favorable evidence, would require more than the mere conclusion and recommendation on the part of the social worker that such substantial risk of detriment existed.

Moreover, the social worker could not rely simply upon the fact that in 1986 Ms. Kuhn had been diagnosed as a paranoid schizophrenic and had a history of mental problems. ▮ As stated in *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540-542 [184 Cal.Rptr. 778]: "Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be 'infected' by the parent. The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety. . . .

"· . . . . . . . . . . . . . . . . . .

". . . It cannot be presumed that a mother who is proven to be 'schizophrenic' will necessarily be detrimental to the mental or physical well-being of her offspring. There are innumerable eccentric parents whose behavior on certain occasions may be less then [*sic*] socially acceptable and yet they are loving and compassionate parents. Conversely, there are parents who

always exhibit socially acceptable behavior publicy [*sic*], but whose children have parent-induced psychological and emotional problems their entire lives. The trial court's duty in this situation is to examine the facts in detail. The social worker must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness. (See 2 Cal. Juvenile Court Practice (Cont.Ed.Bar 1981) Jurisdictional Hearing, § 18.28, p. 120.) The court must then weigh the evidence of the harm which will be caused the children if they remain in parental custody against the harm caused by placing the children in foster care. Only after this balancing has taken place, based on all the available evidence, can the court make an informed decision which can be said to be truly in the best interests of the children." (Fn. omitted.)

 In this case, Dr. Bird made some general statements in his April 1986 report regarding Ms. Kuhn's psychological condition and its negative influence on her parenting ability, but did not demonstrate with specificity how the minor would be harmed. Eight months later, Dr. Schroeder discussed mother's positive progress in therapy and the fact she had maintained emotional stability. Dr. Schroeder requested six months time in which to determine whether the minor should be returned. Prior to the expiration of this six months, the social worker contacted Dr. Schroeder who said that mother was not ready for Heather's return as of April 1987. There is no indication, however, of any further contacts with Dr. Schroeder. Indeed, the social worker's comments in the report of August 27, 1987, were taken verbatim from the report dated May 16, 1987, which had been prepared for an earlier review hearing.

California Rules of Court, rule 1378(c) expressly requires as follows: "Prior to the hearing, the petitioner shall make an investigation and file a supplemental report describing the services offered to the family and the progress made in eliminating the circumstances requiring court supervision and, where relevant, the prognosis for return of the minor to his or her parent or guardian. . . ."

Here, the social worker simply did not comply with California Rules of Court, rule 1378(c). The social worker failed to submit any updated information on Ms. Kuhn's "progress made in eliminating the circumstances requiring court supervision." Instead, the social worker relied on outdated information by simply repeating verbatim in the August 1987 report the contents of a report prepared months before.

Moreover, the outdated psychological evaluation was not the type of evidence which could be deemed credible and of solid value and from which the juvenile court could conclude that minor's physical or emotional well-

being would be threatened if she were returned to the care and custody of her mother at the time of the review hearing on September 18, 1987.

In short, there was insufficient evidence to support the juvenile court's findings and the order appealed from must be reversed for this reason as well. This being the case, we deem it unnecessary to address the additional points raised by appellant and the minor.

## DISPOSITION

The order appealed from is reversed.

Woolpert, Acting P. J., and Pettitt, J.,* concurred.

---

* Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.